*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAY SCOTT CLARK,

Defendant-Appellant.

FOR PUBLICATION
November 19, 2019
9:00 a.m.

No. 343607
Hillsdale Circuit Court
LC No. 17-414055-FC

Before: SWARTZLE, P.J., and GLEICHER and M. J. KELLY, JJ.

SWARTZLE, P.J.

Police take a person into custody for questioning related to a murder. Police explain to the person his rights under *Miranda v Arizona*. The person exercises his right to remain silent, but while being escorted to a cell, he reinitiates a discussion, and police immediately return him to the interview room. He is reminded that his *Miranda* rights had been read to him earlier, and he agrees to talk. Under this fact pattern, must the person's incriminating statements made during the reinitiated interview be suppressed?

Defendant asks us to hold so, but he does so without support. Instead, we hold that there is no bright-line rule that, in the absence of rereading the person his *Miranda* rights a second time when discussions are reinitiated, the person's subsequent statements must be suppressed. Rather, the test is whether, under the totality of the circumstances, the person voluntarily, knowingly, and intelligently waived his right to counsel and to remain silent. Under the circumstances here, there is no basis to suppress defendant's incriminating statements made to police. Further concluding that there is no other ground for reversal, we affirm defendant's convictions for first-degree murder and felony-firearm.

## I. BACKGROUND

### A. THE BODY

On April 2, 2017, the victim's body was found in a wooded area in Hillsdale County. The medical examiner determined that the victim died because he was shot five times; four

-1-

bullets entered his left side and one bullet entered his right side. The medical examiner opined that the shots had been fired contemporaneously and that the single gunshot wound to the victim's right side appeared to be from a smaller bullet. Police recovered two .45 caliber bullets from the victim's jacket and sweatshirt, and concluded that both of those bullets had been fired from the same weapon. In addition, the medical examiner recovered a .45 caliber bullet from the victim's body during the autopsy.

### B. DEFENDANT CONFESSES BUT LATER MOVES TO SUPPRESS

Police officers interviewed Ashley Hoath,[1] a woman who dated the victim at various times. Ashley ultimately pleaded guilty to second-degree murder arising from the victim's death, and the trial court sentenced her to serve 25 to 40 years in prison. This Court denied her delayed application for leave to appeal, *People v Hoath*, unpublished order of the Court of Appeals, entered June 29, 2018 (Docket No. 343918), and our Supreme Court also denied her application for leave to appeal, *People v Hoath*, 503 Mich 889 (2018). Based on information that Ashley provided, police arrested defendant in connection with the victim's death. Police did not immediately interview defendant at the time of his arrest because he was intoxicated.

Deputy Wesley Ludeker and Sergeant Kevin Bradley of the Hillsdale County Sheriff's Department interviewed defendant on the morning after his arrest. Defendant subsequently moved to suppress the statements he gave to police that day.

Sergeant Bradley testified at the pretrial hearing on defendant's motion to suppress that when they questioned him, defendant was cogent, alert, and communicating well. Police recorded defendant's first interview, and during this interview, Deputy Ludeker read defendant his *Miranda* rights from a prepared card. Defendant asked, "So I can stop answering questions any time I want?" According to Sergeant Bradley, Deputy Ludeker agreed that defendant could do so, and defendant said "Okay, then." Deputy Ludeker told defendant that he had spoken with Ashley and she was "selling him down the river" because she blamed him entirely and denied any involvement in the victim's death. At that point, defendant asserted his right to counsel and police ceased the interrogation. The recording of this first interview indicates that it lasted only four minutes.

Deputy Jeffrey Miller testified that he retrieved defendant from the interview room and began escorting him to the jail. Deputy Miller did not recall saying anything to defendant as he escorted defendant back to his cell. When they were just a few feet away from the interview room, defendant said, "Hey, could you tell those guys however Ashley said it happened, I'm willing to sign whatever." Deputy Miller agreed to convey that message, and he secured defendant in his jail cell. Deputy Miller then told Deputy Ludeker what defendant said, and another police officer escorted defendant back to the interview room. Importantly, only a few

---

[1] Because we discuss the testimony of both Ashley Hoath and her sister Jolene Hoath in this opinion, we refer to these witnesses by their first names.

minutes passed between the initial reading of defendant's *Miranda* rights, his invocation of his right to counsel, and his subsequent decision to submit a signed statement.

Sergeant Bradley testified that, after defendant's first interview, he went to the undersheriff's office. Deputy Ludeker then informed the sergeant that defendant reinitiated a discussion, and the two police officers returned to the interview room. Although they did not restart the recording device, they instructed another police officer to do so. Sergeant Bradley admitted that neither he nor Deputy Ludeker reread defendant his *Miranda* rights verbatim from the prepared card after defendant reinitiated the discussion with them.

According to Sergeant Bradley, Deputy Ludeker reminded defendant that he had invoked his right to counsel and asked him if he had changed his mind and wanted to talk to them. Defendant told them that he had changed his mind, he wanted to speak with them, and he immediately informed the officers, "Whatever Ashley said happened, is what happened." Sergeant Bradley testified that, after they had been speaking with defendant for some time, an officer knocked on the door of the interview room and asked him to step outside. Sergeant Bradley learned that the recording of this second discussion had missed the initial 30 to 45 seconds. Sergeant Bradley then reentered the interview room and told defendant that he respected him for speaking with police about the victim's death, waiving his rights, and telling police what happened. Sergeant Bradley said defendant responded "Yeah" and "Thanks."

Deputy Ludeker testified that defendant left the interview room after his first interview, but then asked to return and agreed to waive his rights to counsel and to remain silent. According to Deputy Ludeker, he reminded defendant that he had been read his *Miranda* warnings, then asked defendant if he understood his rights, and defendant said, "Yes." Defendant then explained that he remembered being read his rights, understood them, waived them, and was prepared to give a statement. Deputy Ludeker testified that defendant's first statement after waiving his rights was, "Whatever Ashley said happened is how it happened."

Defendant also testified during the hearing on his pretrial motion to suppress. He acknowledged that Deputy Ludeker read him his *Miranda* rights during the first interview. Although he asserted that he had just been on a nine-day alcohol and drug binge, defendant nevertheless admitted that he understood his rights when they were first read to him. Defendant also admitted that he was brought back to the interview room after stating that he wanted to speak with the two investigating officers. The police officers did not threaten him and treated him "great."

Although defendant conceded that he initiated the second interview with police and that he voluntarily spoke with the police officers during the second interview, he stated that he was "spurred" to do so by Deputy Miller, who said something to get his mind going about Ashley, and he feared that Ashley might be in jail. Yet, defendant did not elaborate on what specifically "spurred" him, and there is nothing in the record to suggest that Deputy Miller badgered defendant to reinitiate discussions. Defendant testified that the police officers did not reread his *Miranda* rights to him before the second interview, but he admitted that Deputy Ludeker reminded him that he had invoked his right to counsel and asked if he wanted to speak to police again.

After the close of proofs at the suppression hearing, defense counsel argued that it was not enough that defendant voluntarily spoke to the officers during the second interview. Instead, defense counsel argued that there was a bright-line rule that the officers had to reread defendant's *Miranda* rights to him verbatim before they could speak to him again. The trial court disagreed with defense counsel that this was the law. The trial court then found that defendant understood his rights and waived them, and concluded that defendant's statements made during the second interview were admissible:

> It would appear clearly to this Court based on the facts that I have before me that the five minute hiatus, Mr. Clark waived his rights. He invoked them. He knew them. He understood them. He initiated conduct [sic]. He was reminded of the fact that those rights were read to him. He [was] asked if essentially he understood them. And that he wished to talk. He admitted yes in all that regard.

> I do not believe that the case law that had been cited referring to Michigan and federal cases require a specific second reading verbatim of *Miranda* rights. And that's what I base my ruling on. If I am mistaken, obviously the rights weren't read and if that's what the appellate courts are standing on the proposition they must be read verbatim, obviously it did not take place here.

> But I don't believe that's what the case law interprets. I don't think that's what the case law requires. So, I deny the motion to suppress. Statements are admissible.

## C. THE TRIAL

*Defendant's Second Interview.* Defendant's second interview was played at trial for the jury. It lasted approximately 30 minutes, including several breaks. As noted earlier, the recording does not capture the beginning of the interview. Instead, the recording begins abruptly with defendant and a police officer already speaking. On the recording, the officers told defendant that they could not simply take Ashley's word for what transpired and that they needed to hear defendant's version of events. The officers also told defendant that they wanted the truth and that they did not want someone to confess if that person was not responsible for the shooting.

During the second interview, defendant told police that he shot the victim with a .45 caliber revolver, that the victim was dead, and that he definitely "pulled the trigger." Defendant admitted that he shot the victim several times, estimating that he had fired "three or four" shots while the victim was seated in defendant's Chevrolet Tahoe. Although defendant stated that he drove 20 to 30 minutes outside of town before he shot the victim, he explained that he could not remember exactly where the shooting occurred because he was intoxicated from the consumption of alcohol and methamphetamine.

Defendant first insisted that Ashley was not with him when he shot the victim. When police told him that Ashley had admitted being there, defendant responded that Ashley did not lie, and if she said that she was there, then she was there. Although defendant never stated to police that he planned to kill the victim, he nevertheless complained that no one was helping

-4-

Ashley, and stated that her father could not "do it." He also told the officers that he had never met the victim prior to the shooting and that he needed Ashley to identify the victim for him.

Police asked defendant about the firearm used to shoot the victim. Defendant stated that the officers would never find the firearm because he had melted it down at his stepfather's house. Police also asked defendant about his Chevrolet Tahoe, and defendant explained that he cleaned the vehicle with a mix of chlorine and peroxide and traded it for the Ford Mustang that he was driving on the day of his arrest. When police asked why the Tahoe's back seat had been burned, defendant asked, "How did you know that I burned the seat?" Defendant then stated that after he burned the back seat, he disposed of it and some bicycles in a scrap yard.

During the second interview, a police officer also told defendant that he had heard—and not just from Ashley—that defendant might have done something like this before. Defendant explained that he told Ashley all kinds of "stuff" to make her feel that he was okay with the victim's death. The police officer responded that Ashley made it sound like defendant used to do "this for a living," implying that defendant was a killer-for-hire. Defendant responded that the victim was the only person he had ever killed.

*Investigation of Vehicle and Ohio Property*. When police arrested him, defendant was driving a Ford Mustang with an Ohio license plate. Jason Eisenmann, who lived in Ohio, testified that he advertised a Ford Mustang for sale online, that defendant offered to trade the Tahoe for the Mustang, and that he accepted the offer. When defendant delivered the Tahoe, Eisenmann saw that it did not have a back seat, but it appeared to be otherwise clean. Eisenmann did not clean the Tahoe; he only drove it for about a week before the fuel pump failed, and police seized the vehicle about two weeks later.

Detective-Lieutenant Lance Benzing testified that he seized the Tahoe from Eisenmann's property. He stated that the Tahoe was missing a back seat and a large section of carpet. Based on information from an informant, Detective-Lieutenant Benzing also searched a property in Ohio owned by members of defendant's family. The property included a "garage-type barn" with a camper. The garage had vehicles, mechanic's tools, welding equipment, and motorcycles; it appeared to be used for both storage and as a place to work on vehicles. The detective saw a burn spot behind the barn and found items within the burn spot—metal bracketing, a piece of vinyl, and a seatbelt buckle—that were consistent with the interior of a Tahoe. He seized a burned vehicle seat on which bicycles had been piled. He transported the vehicle seat back to Michigan, and it fit into the Tahoe. The detective also searched the Ohio home of defendant's brother. He seized a .22 caliber handgun from the brother's residence and found property that belonged to defendant there.

Several forensic scientists employed by the Michigan State Police testified that they were unable to recover evidence from the Tahoe. One stated that she tested the Tahoe and did not find any indication of blood around the area where the back seat would have been. She did recover some blood drops, but they did not match the victim. She stated that, although the chemical used for testing is very sensitive, bleach and other detergents will degrade samples. Another forensic scientist testified that he tested the Tahoe for fingerprints and did not find any that matched the victim, defendant, or Ashley. Finally, a third forensic scientist testified that he was unable to

identify any fibers from the Tahoe on the victim's clothing and did not find any fibers from the victim's clothing in the Tahoe.

*Testimony of Temples and Jolene.* Michael Temples testified that he was a resident of the county jail. For several days, he shared a cell with defendant. Temples testified that defendant was often upset, crying, and distraught. According to Temples, defendant told him that he had already talked to police and that he was in jail because he shot and killed the victim. Defendant told Temples that he turned around in his Tahoe and shot the victim because the victim had called Ashley an unflattering name. Defendant also claimed that the victim was abusing Ashley. Defendant explained that he told the police officers that he cut up the gun he used, but in reality, he put the gun in the sewage tank of a camper. Defendant also told Temples that he washed the Tahoe with bleach and peroxide, removed the Tahoe's back seat, and burned it near the camper. Temples testified that he related defendant's statements to police because "it was the right thing to do."

Defense counsel called Jolene Hoath, Ashley's sister, to testify on defendant's behalf. Counsel asked whether Ashley spoke to her about the victim's death, and Jolene answered that she had. Jolene testified that Ashley stated that she knew that the body that was recently found was the victim's body; Jolene asked Ashley how she knew that the body was the victim's, and Ashley told her that she "did it."

Defense counsel then asked Jolene whether they had other conversations about the victim's death, and Jolene said that they spoke about the matter again the next day. She related that Ashley was distraught, and Ashley stated that she was scared of "the guy" and that the "guy did it." Jolene further testified that Ashley "never said a name." Defense counsel asked Jolene whether Ashley was a habitual liar, but the prosecutor objected and the trial court sustained the objection. Defense counsel then elicited testimony from Jolene that Ashley did not have a reputation for telling the truth.

On cross-examination, the prosecutor asked Jolene about the day when Ashley was crying. The prosecutor asked her if Ashley ever told her the name of the man of whom she was afraid. Jolene stated that Ashley said that she was afraid of defendant. Jolene indicated that Ashley did not say why, just that she was afraid defendant would hurt her. The prosecutor then asked whether Ashley told her that defendant was the person who shot the victim. Defense counsel objected and the trial court overruled the objection. The prosecutor asked the question in a different way: "She told you that this other guy was the one who shot" the victim. Jolene stated, "Yes, she did." On redirect, Jolene explained that Ashley finally told her that defendant was the one who shot the victim after information regarding the victim's death came out in the news.

*Ashley Refused to Testify.* The prosecutor also called Ashley as a witness at defendant's trial, but she refused to testify. Although both parties appear to have believed that Ashley would testify, she refused to do so after she was called to the witness stand. Ashley agreed to testify against defendant as part of a plea deal that allowed her to plead guilty to second-degree murder, and police made defendant aware of the substance of her statements implicating him in the shooting. The prosecutor gave defendant notice that he intended to call Ashley as a witness at his trial, and provided defense counsel with a summary of her criminal convictions, which

suggests that the prosecutor expected that Ashley would testify and be subject to cross-examination.

In the prosecutor's opening statement, he stated that Ashley would be testifying. He informed the jury that she had initially denied any role in the shooting, but that she subsequently admitted participating in the shooting and pleaded guilty to second-degree murder. He stated that Ashley told police that defendant shot the victim, but did not otherwise elaborate about her proposed testimony. Similarly, in her opening statement, defense counsel informed the jury that Ashley would testify. She predicted that when Ashley did so, the jury would see that her statements blaming defendant were not credible, that she was not an innocent victim, and that she was a liar. Defense counsel told the jury that she would also be asking Ashley about an incident during which she beat her sister into unconsciousness, and stated that there would be evidence that Ashley once paid the victim's bond to get him out of jail. Finally, defense counsel argued that the police officers did not conduct a thorough investigation regarding the victim's death, but only chose to investigate those details that fit Ashley's version of events.

On the afternoon of the first day of trial, the prosecutor informed the trial court that his next witness was Ashley, but that she had not yet arrived. The trial court ordered a brief recess. After the trial court resumed proceedings and the jury was seated in the courtroom, the prosecutor called Ashley to the witness stand. The trial court then placed her under oath and asked her to spell her name, which she did. After the trial court told the prosecutor that he could begin his examination, the following exchange occurred in the presence of the jury:

> *The Witness*: Your Honor, I want to file a verbal motion to withdraw my plea.
>
> *The Court*: Ma'am—ma'am—ma'am.
>
> *The Witness*: It was not willful—
>
> *The Court*: Ma'am, you're out of order. This is not the place nor the—the time for that situation, so.
>
> *The Witness*: Well, then I want to plead the Fifth and I ask you to please escort me back to the county jail.
>
> *The Court*: Okay, would you escort the jury back out for a moment, please?

The transcript shows that the entire episode—from calling Ashley to the witness stand to the jury's departure from the courtroom—lasted one minute.

After the jury departed, the trial court advised Ashley that she could not validly assert the Fifth Amendment because she had already pleaded guilty. The trial court further informed her that it would not entertain a motion to withdraw her guilty plea in an unrelated proceeding. After a brief recess, Ashley returned and informed the trial court outside of the jury's presence that she would not testify. As a result, the trial court had her taken back to jail. Before the jury returned, the trial court asked the parties if they wanted a curative instruction to address Ashley's outburst, but both declined.

*Parties' Closing Statements.*  In his closing statement, the prosecutor told the jury that it did not have to rely solely on defendant's recorded statement to police to conclude that he shot the victim because it could also rely on the testimony of Temples:

> But you don't have to necessarily believe the testimony that you saw on the screen.  I want you to remember two words: a name, Michael Temples.  Now, it's one thing to lie to the police or it's one thing to give the police a story, but it's something that's completely different, isn't it, when you're talking to a cell mate or somebody who is not involved with the government or is not involved with the case?  Michael Temples knew nothing of the murder of Jeremy Barron.

> He testified that he hadn't heard about it.  He couldn't come up with the statement that he gave to Detective Lieutenant Benzing without it coming from the defendant himself.  And you use your judgment.  You recall Michael Temples sitting there.  You can judge his credibility based upon circumstances—stances whether he could create this or not.  How could he?  It came from the defendant himself.  Volunteered.  And what did he tell Michael Temples?

> He told Michael Temples that not only did he clean the interior of the car with peroxide, but Michael Temples said bleach and peroxide; you recall that?  And what do we know about bleach?  It is one thing that will remove the DNA according to our expert that testified.  A thorough job to be sure.

> And what else did Michael Temples know from the defendant?  Well, that the defendant shot him; certainly that's important, but what happened to the seat and where it was?  We didn't know that information.  We didn't know exactly where it was until Michael Temples told Detective-Lieutenant Benzing so that he could get a search warrant and find it which he did which also led us to the burn spot.  Makes sense that he would go to the location that has the torches; that has a location where he can be in a safe position to destroy evidence and take care of it without officers from Michigan coming and inspecting until we know the truth.

> Michael Temples, I submit to you ladies and gentleman, is someone who had nothing to gain; simply stating what he heard and stating the truth.

During her closing arguments, defense counsel spent a considerable amount of time discussing the testimony that she elicited from police officers, which, she argued, showed that the officers did not conduct a thorough investigation.  She informed the jury that it should consider whether the "facts fit" with what the prosecutor was trying to "sell" to the jury.  She argued that there was no evidence that put the victim in defendant's vehicle.  Defense counsel faulted the police officers for not sending for analysis a bloody sheet seized from Ashley's house and for failing to follow up on a piece of leather that they also seized.  She also faulted them for failing to follow up on leads that suggested that the victim was still alive after the date when defendant supposedly killed him, and accused the police officers of not doing their jobs; she argued that the police only investigated things that supported Ashley's version of events.  Defense counsel continued to identify flaws in the investigation throughout her closing statement

-8-

and then informed the jury that the police officers had to be able to "explain everything" and they had failed to do so.

The prosecutor rose in rebuttal and attacked defense counsel's theory that the police officers' investigation was so flawed that the jury could not determine what really happened. He argued that the defense was compelled to point out the flaws in the investigation because the defense had to overcome the fact that defendant twice admitted to the murder:

> A little bit of inside baseball here for you, ladies and gentleman. In the defense world, when you have [a] case that doesn't look good for your client or your client made admissions where there's something there that's very obvious; something he said, you shift blame.

> Where's the blame being shift—shifted now? Who's the bad guy here? The police. So now, all of a sudden and by the way, I would think that you would probably not want to run out and become a police officer because you can't win. If you work hard to get evidence and you don't find evidence then that's counted against you. But if you don't work hard enough, that's counted against you. How do you win when you're a police officer?

> All you can do is follow leads; all you can do is your job. But, for a defendant who's trying to get himself out of trouble, they're a good whipping boy, aren't they? They're a good person to pick on for not finding the real killer, like who might that be? Is there evidence of anyone else? Aliens, what, who else? There is no one. You can't suggest that they didn't do a good job because the real killer's out running loose now.

> What we have is the defendant who admitted killing the deceased. And even in spite of that, the police did a tremendous job looking for further evidence. As it turns out the defendant did a good job of concealing it. It's a distraction when you start talking about somebody who saw pictures on Facebook who now believes she saw a dead man that was alive. That's a distraction. Distraction away from something that is more important.

The prosecutor conceded that defense counsel identified areas that the police officers might have investigated further, but he argued that those leads were not in fact worthy of further investigation—they were mere distractions—and did not undermine the evidence that defendant admitted that he shot the victim in the Tahoe:

> Ladies and gentlemen, it is a distraction away from this. The words of the defendant: I shot him. In the world of defending someone, if you can talk about small things like head rests then you poke a little tiny hole in, I shot him. You talk about fingerprints or fibers that are on a floor where you might not even expect them or even on the back of a vinyl seat, you're pokin' a little hole in this big statement, I shot him.

-9-

Again, another little hole; fingerprints, where are they? Why didn't you take the headrest in and do what with it? Well, you didn't do it. So, there you go. I just poked another hole and you know what, she wants you to do. You know what the defendant wants you to do. They want you to look at that hole so closely, so closely that you don't see the big picture when you stand back. These words: I shot him.

The prosecutor closed his rebuttal by arguing that the police officers in fact did an "outstanding job" investigating the victim's murder and opined that "our streets are safer because of that."

After deliberating, the jury convicted defendant of first-degree premeditated murder, MCL 750.316(1)(a), and carrying or possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). The trial court sentenced defendant to serve life in prison without the possibility of parole for his first-degree murder conviction and to serve two years in prison for his felony-firearm conviction.

This appeal followed.

## II. ANALYSIS

On appeal, defendant claims that the trial court should not have allowed the jury to hear the recording of his second interview with police officers, should not have allowed the jury to hear that Ashley pleaded guilty to second-degree murder for her role in the victim's death, should not have allowed Ashley to assert her right to remain silent in the jury's presence, and should not have allowed Jolene to offer hearsay testimony that Ashley implicated defendant in the murder. Defendant also maintains that the prosecutor deprived him of a fair trial through his closing statements, that his trial counsel was ineffective in several respects, and that the prosecutor presented insufficient evidence of premeditation to support the jury's verdict of first-degree murder. As we explain, all of the claims are without merit.

### A. MOTION TO SUPPRESS

#### 1. PRESERVATION

We first address defendant's claim that the trial court erred when it denied his motion to suppress evidence of statements he made to police during his second interrogation. To preserve this claim of error for appellate review, defendant had to object before the trial court and specify the same ground for objection that he asserts on appeal, which he did. See *People v Douglas*, 496 Mich 557, 574; 852 NW2d 587 (2014). Defendant also raises on appeal grounds for excluding his interrogation that he did not raise in the trial court. To obtain relief on those unpreserved claims, defendant must demonstrate plain error that affected his substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

#### 2. STANDARD OF REVIEW

This Court reviews for clear error a trial court's factual findings in a ruling on a motion to suppress evidence. *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014). A trial court's factual findings are clearly erroneous when this Court is left with a definite and firm conviction

that the trial court made a mistake. See *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018). "The decision whether to admit evidence is within a trial court's discretion. This Court reverses it only where there has been an abuse of discretion." *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003). A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Johnson*, 502 Mich at 564. "To the extent that the trial court's ruling involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *Tanner*, 496 Mich at 206 (cleaned up).

### 3. CONSTITUTIONAL CLAIM

In *Miranda v Arizona*, 384 US 436, 467; 86 S Ct 1602; 16 L Ed 2d 694 (1966), the United States Supreme Court established procedures designed to safeguard the right to remain silent protected by the Fifth Amendment, US Const, Am V. The Supreme Court held that when an officer interrogates a person who is in custody, that person must be "informed in clear and unequivocal terms" that he has the right to remain silent and that anything that he says can be used against him in court. *Id.* at 468-469. The Court also determined that the right to have counsel present during the interrogation is indispensable to the protection of the Fifth-Amendment right. *Id.* at 469. Accordingly, a person in custody must also be advised that he has the right to consult a lawyer and have the lawyer present during interrogation, and that, if he cannot afford a lawyer, one will be appointed for him. *Id.* at 471-472.

The Court also established several rules to prevent abuses of these constitutional rights. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-474. Any statements that occur after that point are deemed to be the product of compulsion. *Id.* at 474. Unless the person in custody has been given the required warnings and still waives his rights, "no evidence obtained as a result of interrogation can be used against him." *Id.* at 479. A person in custody may waive his rights if the waiver is made voluntarily, knowingly, and intelligently. *Id.* at 444.

In a case soon after *Miranda*, the Supreme Court had occasion to address what happens when a person in custody asserts his right to counsel. The Court explained in *Edwards v Arizona* that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him." 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981). The assertion of the right to counsel during a custodial interrogation is a per se invocation of the right to remain silent. *Id.* at 485. The Court emphasized that it was "inconsistent with *Miranda*" to allow police officers, "at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Id.* There is, however, an exception to this rule—an officer may again interrogate a suspect who has asserted the right to remain silent, without first providing the suspect with the requested lawyer, if the suspect "initiates further communication, exchanges, or conversations with the police." *Id.* at 484-485.

On appeal in this case, defendant does not argue that the admission of statements he made during his second interview with police were inadmissible because he did not, in fact, reinitiate contact with the officers. Rather, defendant argues that the trial court should have excluded evidence of his statements at trial because the police officers did not explicitly advise him a

second time of his *Miranda* rights before resuming the interrogation. Defendant's position is, however, without support in the law.

The Supreme Court discussed the proper application of the *Edwards* rule in *Oregon v Bradshaw*, 462 US 1039; 103 S Ct 2830; 77 L Ed 2d 405 (1983). In that case, the issue before the Court was whether the initiation by the defendant of a conversation with a police officer constitutes, by itself, a waiver of the defendant's Fifth Amendment rights. *Id.* at 1044 (opinion by Rehnquist, J.). Justice Rehnquist—writing for four Justices—did not agree that that was the case, and concluded that—even after a defendant reinitiates a conversation with police—the burden remains on the prosecutor to show that the defendant waived his Fifth Amendment rights. *Id.* at 1044-1045. Justice Rehnquist then determined that there was no violation of the rule in *Edwards* because the defendant initiated the conversation with the police officer, who reasonably understood that the defendant's question related to the investigation. *Id.* at 1046. After making that determination, Justice Rehnquist explained that the relevant question was whether the defendant validly waived his right to counsel and the right to remain silent under the totality of the circumstances, which included the necessary fact that the accused, not the police officer, reopened the dialogue. *Id.* Justice Rehnquist agreed that the trial court properly concluded that the defendant's statements were voluntary and the result of a knowing waiver of his rights. *Id.* at 1046-1047.

Justice Marshall, who also wrote for four justices, dissented. He did not agree that the defendant initiated a conversation that satisfied the rule in *Edwards* because, in his view, the defendant's statement did not concern the subject matter of the criminal investigation. *Id.* at 1055-1056 (opinion by Marshall, J.). Justice Marshall, however, clarified that the only dispute concerned the application of the law to the facts. Eight justices, he wrote, agreed that *Edwards* established a two-part test: under the first part, courts must ask whether the defendant initiated further communication with the police, and, under the second part, courts must ask whether the defendant made a knowing and intelligent waiver of his rights. *Id.* at 1054 n 2 (opinion by Marshall, J.).

Reading the two plurality decisions from *Bradshaw* together, it is evident that the Supreme Court did not, as defendant suggests in this case, adopt a bright-line rule requiring police officers to readvise a suspect of his *Miranda* rights before speaking with him after he asserts his right to counsel but subsequently reinitiates a conversation with police. Rather, the proper inquiry is whether the defendant reinitiated a conversation on the subject matter of the investigation and whether, under the totality of the circumstances, the defendant knowingly and intelligently waived his rights to counsel and to remain silent. *Bradshaw*, 462 US at 1046 (opinion by Rehnquist, J.), 1048 (opinion by Powell, J.), 1054 n 2 (opinion by Marshall, J.).

Indeed, the rule announced in *Edwards* is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *VanHook v Anderson*, 488 F 3d 411, 416 (CA 6, 2007). The *Edwards* rule embodies two independent inquiries:

> First, courts must determine whether the accused actually invoked his right to counsel. . . . Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated

> further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.  [*Id*.]

See also *Smith v Illinois*, 469 US 91, 95; 105 S Ct 490; 83 L Ed 2d 488 (1984); *United States v Velasquez*, 885 F2d 1076, 1084 (CA 3, 1989) (recognizing that the Supreme Court adopted a two-part test in *Bradshaw*).  The fact that police officers do not again fully advise the defendant of his *Miranda* rights after he reinitiates communication with them is just one factor to consider under the totality of the circumstances.  See *Pittman v Black*, 764 F2d 545, 547 (CA 8, 1985) ("Following the invocation of his right to counsel, [the defendant] himself initiated further conversation with the police.  The officers' response to [his] question and the interrogation following that response would not have caused [the defendant] to forget the rights of which he had been advised and which he had understood moments before.") (cleaned up); see also *Kansas v Brown*, 305 Kan 674, 683, 686-687; 387 P3d 835 (2017) (stating that the test is whether the defendant initiated the renewed interrogation and, in doing so, knowingly and intelligently waived his previously asserted right to counsel, and further stating that whether the law requires renewed *Miranda* warnings depends on the totality of the circumstances); *California v Jackson*, 1 Cal 5th 269, 340-341; 376 P3d 528 (2016) (noting that whether the officers must renew *Miranda* warnings depends on the totality of the circumstances and that renewed warnings were not required in that case because the interview was reinitiated minutes after the break in questioning, was in the same location, and was with the same police officers).  Additionally, this Court has held that "police are not required to read *Miranda* rights every time a defendant is questioned." *People v Littlejohn*, 197 Mich App 220, 223; 495 NW2d 171 (1992).  Indeed, the *Littlejohn* Court stated that it was sufficient that the police officer reminded the defendant that he had earlier been advised of his rights and asked whether he still understood them after the defendant "independently initiated contact" with the officer. *Id.*

In this case, defendant relies heavily on *People v Kowalski*, 230 Mich App 464; 584 NW2d 613 (1998), for the proposition that police officers must give new and adequate warnings before again interrogating a person who has previously asserted his right to counsel.  Because the *Kowalski* case presented an "unusual procedural history," *id*. at 466, and this Court construed and applied the law as it existed in 1975, before the United States Supreme Court's decision in *Edwards*, *id*. at 472, we reject defendant's reliance on *Kowalski* for guidance here.  In any event, the *Kowalski* Court did not focus on whether police officers were required to reread defendant his *Miranda* rights verbatim after he reinitiated contact with police, but on whether the defendant was subject to police-initiated interrogation before he gave his confession. *Id*. at 484.

Defendant admitted that he reinitiated contact, and the record confirms this.  He told Deputy Miller to convey to the other officers that whatever Ashley said happened was what happened, and he was even willing to sign a statement to that effect.  As the trial court recognized, defendant's statement demonstrated that he wanted to make a statement right then about the shooting and that he intended his statement to concede that events were as Ashley described to police.  The trial court did not err when it determined that there was no binding authority for the proposition that the police officers were required to readvise defendant of his *Miranda* rights simply because he had earlier invoked his right to counsel.  Rather, once it found that defendant initiated the renewed interrogation, the remaining question was whether, under the totality of the circumstances, defendant knowingly and intelligently waived his right to counsel and his right to remain silent.

-13-

Apart from attempting to draw a bright-line rule where none exists, defendant has not argued on appeal that he could satisfy the totality-of-the-circumstances standard. And, indeed, he cannot. The time lapse between when defendant initially invoked his right to counsel, then reinitiated discussions, and then began talking again with the officers was only a few minutes. A typical bathroom break during an interrogation might last as long as the time lapse here. Moreover, as the trial court found, the officers reminded defendant that his *Miranda* rights were recently read to him, and he continued talking with the officers. Given the brief time lapse, the reminder was adequate under the circumstances, and defendant's claim fails.

## B. MRE 106

Defendant next argues that the trial court erroneously admitted the recording of his statements in violation of MRE 106. The rule provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." MRE 106 has no bearing on the admissibility of the underlying evidence; rather, it allows the adverse party to supplement the record to provide a complete picture. See *People v McGuffey*, 251 Mich App 155, 161; 649 NW2d 801 (2002). "Thus, the rule of evidence would only be pertinent if defendant sought, but was denied, permission to have a complete writing or recorded statement introduced." *Id.*

On appeal, defendant does not complain that the prosecutor played only a part of the recording of his statements and that the trial court prevented him from playing the remainder or offering another recording or writing that would have provided a fuller picture for the jury. The record shows that the jury watched all those portions of the police officers' encounter with defendant that were recorded. The fact that the officers failed to record a few moments of the second interrogation does not implicate MRE 106. The jury saw the complete recording that existed and defendant has not identified on appeal any other recording or writing that ought to have been considered contemporaneously with his confession. Moreover, nothing prevented defendant from eliciting testimony from the police officers to fill in the gaps created by the failure to record defendant's entire interview.

Defendant relies on authorities outside the jurisdiction for the proposition that the rule of completeness stated in rules analogous to MRE 106 bars the admission of video evidence where the video does not show the whole interrogation. Specifically, defendant cites *Arizona v Steinle ex rel Maricopa Co*, 237 Ariz 531; 354 P3d 408, 412 (2015), vacated in relevant part and remanded for further proceedings 239 Ariz 415 (2016), and *United States v Yevakpor*, 419 F Supp 2d 242, 252 (ND NY, 2006), in support. Both of those cases, however, involved situations where the recording had been modified and the original erased. Under those circumstances, the courts determined that it would be fundamentally unfair to allow the prosecutors to admit the altered videos. *Steinle*, 237 Ariz at ¶¶ 11-12; *Yevakpor*, 419 F Supp 2d at 251-252. In this case, no one contends that the video at issue had been altered in any way; defendant merely finds fault with the officers' failure to start the recording device earlier. In short, neither MRE 106 nor the other authorities lend support to defendant's argument.

## C. MCL 763.8

Defendant also claims that the trial court erroneously admitted the recording of his statements in violation of MCL 763.8. Under this provision, the Legislature requires any law enforcement agency that has recording equipment to record the "entire interrogation" of an individual who has been subjected to a custodial interrogation regarding his involvement in a major felony. See MCL 763.8(2). Even assuming arguendo that the police violated this provision, the violation does not warrant relief here.

The Legislature provided a specific and limited remedy for any violation of MCL 763.8: the "jury shall be instructed that it is the law of this state to record statements of an individual in custodial detention who is under interrogation for a major felony" and that it "may consider the absence of a recording in evaluating the evidence relating to the individual's statement." MCL 763.9. The Legislature also provided that evidence of the individual's statement may still be admitted if otherwise admissible under the law. See *id*. That is to say, the Legislature's remedy applies to evidence concerning an unrecorded statement.

With MCL 763.8, the Legislature codified its preference for recorded statements. With MCL 763.9, the Legislature set forth the remedy for violating the prior section—a jury instruction. The Legislature did not codify an exclusionary rule for the part of the interrogation that was recorded, and we will not create one here. See *People v Hawkins*, 468 Mich 488, 500, 507-511; 668 NW2d 602 (2003). The Legislature went so far as to state that the provision for recordings did not give the interrogated person any substantive rights. See MCL 763.10 ("The requirement in section 8 of this chapter to produce a major felony recording is a directive to departments and law enforcement officials and not a right conferred on an individual who is interrogated."). The trial court did not plainly err when it allowed the recorded portions of defendant's second interrogation to be played for the jury notwithstanding any violation of MCL 763.8(2). See *Carines*, 460 Mich at 763. As to whether the trial court erred by not instructing sua sponte the jury in accordance with MCL 763.9, assuming the missing minute or so fell within MCL 763.8, we conclude that the absent instruction did not affect defendant's substantial rights.

## D. *MUSSER* ERROR

Defendant also briefly argues that the recording of his statements to police should have been excluded because an interrogating officer asserted on the video that Ashley said that defendant was a killer for hire or a serial killer, which was inadmissible hearsay, irrelevant, and highly prejudicial other-acts evidence. An interrogator's questions are not ordinarily offered for the proof of the matter asserted; as such, the questions are typically not hearsay. See MRE 801(c). Nevertheless, it may be proper for the trial court to redact an interrogator's question or statement when the statement is not relevant to providing context for the accused's answer or is otherwise excludable under MRE 403. See *People v Musser*, 494 Mich 337, 354-359; 835 NW2d 319 (2013).

On appeal, the prosecutor concedes that admission of the police officer's questions relating to Ashley's purported statement qualifies as plain error. Yet, because defendant did not object to the question, defendant must also show that the error affected his substantial rights. See *Carines*, 460 Mich at 763.

Defendant has not shown this. There was substantial evidence that defendant killed the victim. Defendant admitted—both in the second interview and to a fellow inmate—that he shot and killed the victim and then took steps to conceal the crime. Physical evidence corroborated his admissions. Moreover, the officer's comment was brief, and defendant immediately denied that he had killed anyone else. He also offered a plausible explanation for how Ashley might have come to the conclusion—he stated that he told her things to make her think he was okay with the victim's death. The officers appeared to accept this explanation and did not ask defendant any further questions regarding the issue. On this record, any error in the trial court's admission of this portion of the recording does not merit relief. See *id*.

### E. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues—with scant discussion of the record or relevant law—that defense counsel was ineffective for failing to raise various grounds for excluding the second interrogation. Defendant did not move for a new trial or for a remand to seek a hearing under *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973). Accordingly, we review only for those errors evident in the record. *People v Gioglio (On Remand)*, 296 Mich App 12, 19; 815 NW2d 589 (2012), remanded for resentencing 493 Mich 864 (2012).

Defendant's cursory treatment of his claims of ineffective assistance amounts to the abandonment of his claims on appeal. See *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006), aff'd 482 Mich 851 (2008). In any event, defendant has not shown that defense counsel's failure to raise the now-desired objections or ask for a redaction of the recorded interview amounted to ineffective assistance of counsel that warrants a new trial.

As already explained, MCL 763.8 and MRE 106 did not provide a plausible basis for excluding the recording at issue. Defense counsel cannot be faulted for failing to make a meritless motion to exclude the recording from evidence under MCL 763.8 or MRE 106. See *People v Riley (After Remand)*, 468 Mich 135, 142; 659 NW2d 611 (2003).

Moreover, defendant has not shown that defense counsel's failure to request the redaction of part of the recording fell below an objective standard of reasonableness under prevailing professional norms. *Gioglio*, 296 Mich App at 22. Defense counsel argued that the jury should closely examine defendant's body language and demeanor during the video. She suggested that the police officers prodded him and got him to give answers that fit their theory (the version of events offered by Ashley), but that the totality of the circumstances showed that defendant did not really know what happened. She further suggested that the evidence showed that defendant only confessed to the murder because he was trying to cover for Ashley. Given this theory, a reasonable trial lawyer might conclude that it would be better to allow the jury to see the whole recording rather than redact portions and leave the jury guessing about the redacted portions. Indeed, defendant responded to the inadmissible question about other killings by informing the officers that he told Ashley things to make her feel better about the victim's death. The statement fit with the defense theory that defendant would say or do anything to help Ashley, which permitted an inference that defendant might not have been telling the truth when he told the officers that he killed the victim. Because this Court can conceive of a legitimate strategic reason for failing to request the redaction, we cannot conclude that defense counsel's failure to

request the redaction fell below an objective standard of reasonableness under prevailing professional norms. See *id.*

Finally, even if we were to assume that defense counsel's performance fell below an objective standard of reasonableness, we nevertheless conclude that it was not reasonably probable that these failures affected the outcome of the trial. The evidence of defendant's guilt was overwhelming and whatever prejudice might have been caused by these failures did not affect the outcome of the trial. See *id.* Defendant has not identified any ground for precluding the introduction of the recording at issue at trial, and he has not shown that defense counsel's handling of the admission of that recording constituted ineffective assistance. The trial court did not err when it admitted the recording.

## F. ASSERTION OF THE FIFTH AMENDMENT

### 1. STANDARDS OF REVIEW

We next consider defendant's claim that the trial court and prosecutor deprived him of a fair trial when they allowed Ashley to assert her Fifth-Amendment rights in the presence of the jury. This Court reviews de novo claims of constitutional error, prosecutorial misconduct, and interpretation of evidentiary rules. This Court reviews the effect of an unpreserved constitutional error under the plain-error standard, *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009), and a trial court's evidentiary decision for an abuse of discretion, *People v Roper*, 286 Mich App 77, 90; 777 NW2d 483 (2009).

### 2. ANALYSIS

Our Supreme Court discussed the types of error implicated when a witness asserts his Fifth-Amendment rights before the jury in *People v Gearns*, 457 Mich 170; 577 NW2d 422 (1998),[2] overruled in part on other grounds by *People v Lukity*, 460 Mich 484, 494; 596 NW2d 607 (1999). The *Gearns* Court indicated that a witness's assertion of the Fifth Amendment in front of a jury implicates evidentiary error and two types of constitutional error—the defendant's right to confront the witness and prosecutorial misconduct that interferes with the right to due process. *Id.* at 180, 187-188, 193.

Defendant argues that Ashley's assertion of the Fifth Amendment before the jury violated his right to cross-examine her. As our Supreme Court stated in *Gearns*, however, a defendant's right to confront a witness in the context of the witness's assertion of her Fifth Amendment right

---

[2] Although the *Gearns* Court was divided, a majority of the justices concurred with Justice BRICKLEY'S recitation and application of the constitutional and evidentiary law. See *Gearns*, 457 Mich at 208 (opinion by CAVANAGH, J.) (concurring in Part IV of Justice BRICKLEY'S opinion, which addressed evidentiary error), 222 (opinion by WEAVER, J.) (joining Justice BRICKLEY'S constitutional analysis, which was Part III of his opinion). Accordingly, Sections III and IV of Justice BRICKLEY'S opinion represent binding law. See *Felsner v McDonald Rent-A-Car, Inc*, 193 Mich App 565, 569; 484 NW2d 408 (1992).

does not arise unless there was substantive evidence put before the jury in the form of testimony or its functional equivalent. *Id*. at 182. The prosecutor never got the opportunity to ask Ashley a question. Thus, her assertion of a privilege was not associated with any questions that could serve as the functional equivalent of testimony. See *id*. at 186-187.

The prosecutor did state in his opening statement that Ashley would testify and had implicated defendant in the shooting, but he did not elaborate on the specifics of her proposed testimony. Furthermore, the prosecutor's statement that Ashley would link defendant to the shooting was not a vital component of the case because that fact was overwhelmingly established by defendant's statement to the police, his admissions to Temples, and the physical evidence that corroborated his statements. Notably, the prosecutor did not paraphrase any proposed statements by Ashley that implicated premeditation, and he did not rely on her statements in his closing argument. Moreover, because the opening statement was separated in time from Ashley's assertion of the privilege, defense counsel responded to the prosecutor's summary in her opening statement, and the trial court instructed the jury that the parties' opening statements were not evidence, it cannot be said that the prosecutor's statements amounted to the functional equivalent of testimony. See *id*. Under these circumstances, defendant has not established that he was deprived of his right to confront Ashley. Finally, merely calling Ashley as a witness was insufficient to establish prosecutorial misconduct. *Id*. at 192. Consequently, her assertion of the Fifth Amendment before the jury did not give rise to any plain constitutional error.

Turning to the question of evidentiary error, it is evident that Ashley was an accomplice, codefendant, or otherwise intimately connected to the murder. There is nothing in the record to suggest, however, that the prosecutor knew that Ashley would assert a privilege to avoid testifying. Rather, as already discussed, the record evidence showed that Ashley agreed to testify as part of her plea deal, had already pleaded guilty, and both the prosecutor and the defense expected her to testify. In the absence of evidence that the prosecutor knew that Ashley would assert her privilege in front of the jury, defendant cannot establish a plain evidentiary error. See *Carines*, 460 Mich at 763; *Gearns*, 457 Mich at 193.

Defendant also argues in passing that he was deprived of the right to confront Ashley because Sergeant Bradley testified that Ashley's statements led to defendant's arrest and that she was awaiting sentencing for second-degree murder. Defendant appears to raise these issues in the context of his claim that Ashley's assertion of the Fifth Amendment before the jury prejudiced his trial. To the extent that defendant might be asserting independent claims of error premised on that testimony, he abandoned those claims by failing to discuss the relevant law and how it might apply to the facts of this case. *Martin*, 271 Mich App at 315.

In any event, Sergeant Bradley did not relate the actual statement that Ashley made to police. He merely stated that Ashley gave them information and that information led them to arrest defendant. This testimony did not implicate defendant's right to confront Ashley. See *People v Dendel (On Second Remand)*, 289 Mich 445, 452-453; 797 NW2d 645 (2010). Defendant has not explained how Sergeant Bradley's testimony that Ashley was awaiting sentencing for second-degree murder was inadmissible. And his testimony to that fact was consistent with defense counsel's eliciting of testimony from Ashley's sister that she admitted killing the victim. Thus, even assuming error, there was no prejudice. See *Carines*, 460 Mich at 763. Similarly, although the prosecutor remarked in his closing argument that Ashley had

pleaded guilty to second-degree murder, which fact was not in evidence because the trial court only allowed Sergeant Bradley to state that Ashley was awaiting sentencing for second-degree murder, that misstatement was fleeting and was consistent with defense counsel's theory that Ashley alone was responsible for the victim's death. Any prejudice occasioned by that statement was minimal and the trial court's instruction that the attorney's remarks were not evidence cured whatever marginal prejudice the remark may have caused. See *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008).

## G. HEARSAY EVIDENCE

### 1. STANDARD OF REVIEW

Defendant also argues that the trial court erred when it allowed the prosecutor to elicit inadmissible hearsay from Jolene regarding Ashley's identification of defendant as the shooter. The trial court admitted the testimony based on its conclusion that defense counsel opened the door to that testimony. This Court reviews a trial court's decision to admit evidence for an abuse of discretion. See *Roper*, 286 Mich App at 90.

### 2. ANALYSIS

Hearsay is defined to be a "statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Defense counsel elicited testimony from Jolene that Ashley made various statements that left the impression that Ashley admitted that she alone killed the victim or that some man other than defendant was involved. To the extent that Jolene testified that Ashley implicated "some guy," her testimony was clearly inadmissible hearsay under MRE 801(c) and MRE 802. The trial court had the discretion to allow the prosecutor to inquire further of Jolene and correct any false impressions that the jury might have had as a result of defense counsel's questioning on direct examination. See *Grist v Upjohn Co*, 16 Mich App 452, 482-483, 168 NW2d 389 (1969); *United States v Georgiou*, 777 F3d 125, 144 (CA 3, 2015). Because the prosecutor limited his cross-examination to correcting the false impression that Ashley implicated some man other than defendant, which was the very harm created by defense counsel's questioning, it cannot be said that the trial court's decision to allow Jolene's clarification on cross-examination fell outside the range of reasonable outcomes. See *People v Daniels*, 311 Mich App 257, 264-265; 874 NW2d 732 (2015).

Defendant also argues that the admission of the hearsay statements violated his right to confront the witnesses against him because he could not cross-examine Ashley about her statements to Jolene. The Sixth Amendment to the United States Constitution guarantees the right of an accused to confront the witnesses against him. See US Const, Am VI; see also Const 1963, art 1, § 20. The Confrontation Clause prohibits the admission of out-of-court statements that are testimonial in nature unless the declarant was unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant. See *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). A statement is testimonial if the declarant should reasonably have expected that her statement would be used in a prosecutorial manner and an objective witness would believe that the statement would be available for use at a later trial. See *Dendel*, 289 Mich App at 453.

Jolene testified about private conversations that she had with her sister while driving, at work, and at some other unspecified time and place. There was nothing about the context that would lead one to conclude that the statements were testimonial in nature. See *People v Taylor*, 482 Mich 368, 378; 759 NW2d 361 (2008). Accordingly, the Confrontation Clause did not apply.

## H. PROSECUTORIAL MISCONDUCT

Defendant next argues that the prosecutor deprived him of a fair and impartial trial by making improper remarks during his closing and rebuttal remarks. To preserve a claim of prosecutorial misconduct, the defendant must make a timely and specific objection to the conduct at trial. See *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). Because defendant did not object to any of the prosecutor's remarks, he did not preserve these claims for appellate review. Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights. *Id.* at 382.

Defendant argues that the prosecutor made improper remarks during his closing and rebuttal arguments. "The purpose of closing argument is to allow attorneys to comment on the evidence and to argue their theories of the law to the jury." *People v Finley*, 161 Mich App 1, 9; 410 NW2d 282 (1987). A prosecutor may jeopardize the defendant's right to a fair trial during closing arguments by injecting broader issues than the defendant's guilt or innocence. See *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007).

Defendant argues that the prosecutor improperly stated in his closing remarks that Ashley pleaded guilty to second-degree murder. Defendant, however, abandoned this claim of prosecutorial misconduct by failing to offer any meaningful argument on appeal. See *Martin*, 271 Mich App at 315. Moreover, as already explained, to the extent that the prosecutor's remark amounted to arguing a fact not in evidence, the remark did not amount to plain error that prejudiced defendant's trial. See *Carines*, 460 Mich at 763.

Similarly, defendant's claim that the prosecutor improperly vouched for Temples in his closing remarks is without merit. A prosecutor may not vouch for the credibility of a witness by conveying to the jury that he has some special knowledge that the witness is testifying truthfully. See *People v Bahoda*, 448 Mich 261, 277; 531 NW2d 659 (1995). The prosecutor may, however, argue from the facts that a witness is worthy of belief. See *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

The prosecutor told the jury that it did not have to rely solely on defendant's recorded statement to police to conclude that he shot the victim because it could also rely on the testimony of Temples. Although defendant focuses his criticism of the prosecutor's remarks on the last sentence, indicating that Temples stated the truth, the prosecutor's remarks must be examined in context. See *Brown*, 294 Mich App at 382-383. When examined as a whole, it is evident that the prosecutor did not imply that he had special knowledge that Temples was telling the truth. See *Bahoda*, 448 Mich at 277. Rather, he argued that Temples' testimony was credible because it was corroborated by other evidence, which was a proper argument. See *Seals*, 285 Mich App at 22. Moreover, there was no evidence that Temples had been offered anything or expected anything in exchange for his statements to police. Indeed, he stated that he informed police

officers about defendant's statements because it was "the right thing to do." Therefore, the prosecutor could also argue that Temples had nothing to gain by coming forward to the police officers. See *Bahoda*, 448 Mich at 282.

Defendant further argues that the prosecutor improperly argued that defense counsel was trying to mislead the jury, which suggests that defense counsel did not believe her own client. A prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury. See *People v Watson*, 245 Mich App 572, 592-593; 629 NW2d 411 (2001). But it is not improper for a prosecutor to comment on the weakness of a defense theory. *People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995). Additionally, a prosecutor's remarks, which might be improper in his closing statement, may be proper when offered to rebut an argument proffered by the defense in closing. See *Watson*, 245 Mich App at 593.

The prosecutor's remarks were proper comment on the defense theory of the case. The prosecutor did not denigrate defense counsel or otherwise suggest that defense counsel did not believe her own client. Furthermore, when considered in context and as a response to defense counsel's closing arguments, the prosecutor's remarks during rebuttal did not amount to commenting that defense counsel was intentionally trying to mislead the jury. See *id*. at 592-593. Rather, the remarks were proper commentary on the weakness of the defense theory of the case. See *Fields*, 450 Mich at 115. The prosecutor did not engage in any misconduct that deprived defendant of a fair trial.

## I. SUFFICIENCY OF THE EVIDENCE

Finally, defendant argues that the prosecutor failed to present sufficient evidence from which a reasonable jury could find that he killed the victim with premeditation. This Court reviews a challenge to the sufficiency of the evidence by examining the "record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *Roper*, 286 Mich App at 83.

First-degree murder is, in relevant part, "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing," or murder "committed in the perpetration of, or attempt to perpetrate" certain enumerated offenses. MCL 750.316(1). It is, in essence, second-degree murder with an added element. See *People v Carter*, 395 Mich 434, 437; 236 NW2d 500 (1975). When first-degree murder is premised on premeditation, the prosecutor must prove that the defendant acted with the intent to kill the victim and must show that he acted deliberately and with premeditation. See *People v Dykhouse*, 418 Mich 488, 495; 345 NW2d 150 (1984).

A murder is committed deliberately if done without adequate provocation—that is to say while undisturbed by hot blood, *People v Scott*, 6 Mich 287, 294 (1859); *People v Morrin*, 31 Mich App 301, 330-331; 187 NW2d 434 (1971), rejected not in relevant part by *People v Reese*, 491 Mich 127, 147-148; 815 NW2d 85 (2012) (stating that then-Judge LEVIN's discussion if imperfect self-defense was obiter dictim), and it is premeditated if the perpetrator had the opportunity to consider his or her actions for some length of time before completing the murder, *People v Tilley*, 405 Mich 38, 44-46; 273 NW2d 471 (1979); see also *People v Oros*, 502 Mich

229, 242-244; 917 NW2d 559 (2018) (discussing the proofs necessary to show premeditation and deliberation).

In proving an actor's state of mind, the jury may rely on circumstantial evidence and the reasonable inferences arising from that evidence; indeed, minimal circumstantial evidence is sufficient to establish that a defendant had the intent to kill and proceeded with deliberation and premeditation. *Unger*, 278 Mich App at 223. The prosecutor may establish premeditation and deliberation through evidence of the parties' prior relationship, the defendant's actions before the killing, the circumstances surrounding the killing itself, or the defendant's conduct after the killing. *People v Schollaert*, 194 Mich App 158, 170; 486 NW2d 312 (1992).

The prosecutor presented defendant's own words to establish that defendant shot the victim in the back seat of defendant's vehicle. Defendant told police that he shot the victim three or four times with a .45 caliber revolver. Defendant indicated that he was with Ashley, that the victim was in the backseat, and that they had driven outside of town for about 30 minutes when he shot the victim. Additionally, defendant indicated to the officers that he loved Ashley and her children, and he stated that the victim was preventing Ashley from being reunited with her children, which suggested that defendant had a motive to kill the victim. Defendant also indicated that no one else was helping Ashley and that her father was not in a position to "do it." He stated that he had never met the victim before the day of the shooting, and he even needed Ashley to identify the victim. Therefore, there was sufficient evidence to establish premeditation, and defendant's final claim for relief fails.

## III. CONCLUSION

After being taken into custody for questioning and being advised of his *Miranda* rights, defendant invoked his right to remain silent. Just moments later, he reinitiated discussions with the police and confessed. Under the totality of the circumstances, the police did not need to reread defendant's *Miranda* rights to him before the second discussion began. Furthermore, as explained, there is no other ground to reverse defendant's convictions for first-degree murder and felony firearm. Accordingly, we affirm his convictions.

/s/ Brock A. Swartzle
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly

-22-